15-4095, USA v. George Rafidi, oral argument, 15 minutes per side, Mr. Allenbaugh for the appellant. Good morning, your honors. Good morning. I'll be addressing four issues that we note in the brief. One, the first will be whether or not 111 constitutes a crime of violence, conviction under 111B specifically, the purported Brady violation that we allege. I will not be addressing and do submit on the briefs the sleeping juror argument that we contend there was a juror misconduct and that the district court should have investigated that. And then finally, I'll be addressing the 8th Amendment claim that the 924C sentencing enhancement violated the 8th Amendment in this case. So there's two, with respect to the first issue, the crime of violence, there's two rather complex statutes. The first statute we have is 924C that provides three different levels of enhancement if a gun is present with respect to a qualifying predicate offense. So 924C provides either a five-year, seven-year, or lifetime sentencing enhancement if the gun is possessed, brandished, or actually discharged. So in my client's case, he was convicted under the second portion, the brandishing of a firearm with respect to 924C. The issue now turns then to the underlying predicate offense, 111B, sometimes referred to as the federal aggravated assault statute. But as the court, I'm sure, is aware, there are many, many other issues or many, many other types of offense that are covered by that statute, not just assault. Just as an example, mere interference or impeding law enforcement would constitute a violation of 111. 111, in turn, has three ways to violate that statute, and those are under sub-A1, there is a misdemeanor provision, which is essentially, if you will, misdemeanor assault or just merely impeding or interfering or obstructing law enforcement, federal law enforcement in the exercise of their duties. There is a second prong there under A2, which doesn't apply in this case, where there is actual physical contact. A violation of just 111A1, in and of itself, is simply a misdemeanor. A violation of A2, however, is an eight-year felony. Now, there is a third provision under 111, 111B, which I would call a super felony, if you will. If you violate either A1 or A2, and there is a gun present, or it doesn't specify a gun, but any type of dangerous weapon, now that felony goes from the misdemeanor can turn into a 20-year felony, or the eight-year felony turns into a 20-year felony. So the issue here, my client was convicted under 111A1, the misdemeanor, and B. B was the enhancement, or it turned the misdemeanor into a felony because a gun was present. Is it just a gun is present, or that it was using a deadly or dangerous weapon? It was using, excuse me, you're right, yes. It was using a gun during the commission of the offense. So now the issue is, specifically, if a defendant is convicted under the misdemeanor prong under A1, and used a gun during the commission of that misdemeanor, obviously it clearly constitutes a felony under 111B. That's not the issue. We concede that. The issue now is whether that conduct, as specified by 111A1 and B, constitute a crime of violence for 924C purposes. But is it not true that 111A provides whoever forcibly assaults, resists, suppresses, intimidates? Am I right that the word forcibly is in that language in 111A that your client was convicted of? That is correct. Forcibly assaults, but I do not read the statute, and I do not believe the government argues it either, that forcibly can be applied to all those different iterations of the statute. In other words, one need not, to violate 111A1, forcibly interfere or impede. One need only interfere or impede. You're saying forcibly modifies only the first word assault? Correct, Your Honor. And what support do you have for that position? We don't make that argument. The government doesn't make that argument. That's not an issue that we address in our briefs. But just plain language of grammar, I would argue that that forcibly assaults, or forcibly only modifies the first assault privilege. Your position then is we can't look at the word forcibly in 111A. And so my question is what basis do you have for that? Is there a case that says that? I do not have a case to cite in that regard, Your Honor. So now the issue is whether now that the gun is present and used, does that now constitute categorically a crime of violence for 924C purposes? And what we argue is that it does not. And the reason being is that one can engage in 111A1 slash B conduct without engaging in violent physical force. That's what constitutes a crime of violence for 924C purposes. It must be violent, the use of or threatened use of violent physical force. So if I'm standing at my doorway, refusing to allow law enforcement to come in, certainly impeding, and I have a gun in my hand, as my client did, does that constitute violent physical force? And we submit that it does not. And again, can you give me the cases that most clearly support your position? I would point the court to this court's opinion in Rede-Mendez, that's R-E-D-E-M-E-N-D-E-Z 680F3-552, where this court notes that not every crime becomes a crime of violence when committed with a deadly weapon. This court goes on in Rede-Mendez to state that the underlying crime must already have as an element some degree of or the threat of physical force. So we go back to what the underlying offense was. The underlying offense was 111A1 slash B, which in turn the underlying offense to that was really A1. My client committed a misdemeanor. And then we get back on the A1 to whether the word forcibly applies, because if your reading is wrong, if forcibly applies to all the others, then wouldn't this constitute a crime of violence? I do not believe so, Your Honor. Let's assume for a minute that forcibly does. Let's concede that for argument. Forcibly impede or forcibly interfere does not in and of itself, just the mere presence of a gun also, we'll add that in, but forcibly impeding or forcibly interfering does not necessarily connote violent physical force. Forcibly could just be, again, standing there, refusing to move or resisting the movement. Again, resisting is also another prong under 111. So forcibly resisting, does that necessarily connote violent physical force? I submit it does not. And the government certainly has not argued that, nor am I aware of any case law on that. The government does, actually, excuse me, strike that. The government does cite to the Fourth Circuit in Burrell in a per curiam opinion, a very short per curiam opinion, where there the Fourth Circuit just held in a summary fashion that a violation of A1 slash B, 111A1 slash B, did constitute a crime of violence. But the only reason why the court did that there is as we cite in our reply on page 6, page 6 of our reply, the district court specifically made a finding, and the defendant in that case specifically was held liable for physical contact. So in Burrell, the issue, clearly there was violent physical force was there because that was alleged in the indictment, and that is what the defendant was found guilty of. That is not the case here. The government readily concedes that there is no evidence, my client was never charged with, nor was convicted of, actually touching, engaging in any type of touching of any law enforcement. So I would again point this court to Red A-Mendez, United States Red A-Mendez. Okay, turning to the next issue, this is the Brady issue, and I believe this is perhaps most germane to the appeal. As we note in our briefs, the defense counsel and the defendant were not aware of this thing called a FARO scan until about three-quarters of the way through the government's trial. That FARO scan was not actually disclosed to counsel and the defendant until several weeks after trial. Hopefully the court... There was a reference to it on page 9 of some document. Yes, there was in fact a reference to it. It was buried within the discovery. There was no explanation for even what a FARO scan was. A FARO scan is not like, say, a DNA test or a blood test. A FARO scan is actually a brand name for a three-dimensional laser scanning device. And what exactly a FARO scan is, it's about as high as this podium here. It's a little computer about the size of a desktop computer that sits on a pole, and it swings around in three dimensions in a crime scene, taking millions of data measurements to recreate a three-dimensional environment for purposes of determining bullet trajectories that now you can, as a prosecutor, perhaps a defense attorney, use at trial to show different perspectives of where people were standing, where the bullets went, where the gun was being held, and where other people were involved, or where other people were at at the time of the offense. The bare reference, as we argue in our opening brief, the bare reference does not constitute an actual disclosure, especially here, where the government is contending, look, the FARO scan is just neutral evidence. It's just a three-dimensional rendering of two-dimensional photographs. Well, here the government, as it usually does, disclosed the two-dimensional photographs, the actual photos to us. We did not need to guess what these photos are. We were provided those electronically. There is no reason why the government could not also provide this FARO scan and at least identify what it was. We were left to guess, and in the context of the way it was disclosed, it simply appeared to have something to do either with a simple measurement, perhaps, and that wasn't even clear, or something to do with the client's background, his criminal background check. And I see I'm just about out of time. I'll also submit on the briefs with respect to the Eighth Amendment issue as well. Thank you. May it please the Court. My name is Dan Ranke. I represent the government. The FARO scan was—the existence of the FARO scan was disclosed to defense counsel approximately four months before trial. But it was on page 9 of some document, right? It was in a— It was mentioned very briefly. Right. It was in a three-ring binder. It was about that big. And it was within the BCI reports. And it mentioned that BCI had conducted a FARO scan. A FARO scan is actually a fairly new— As the district court noted, it's a fairly new tool that law enforcement uses. But it doesn't show— In this case, it doesn't show— All it shows is a three-dimensional, computer-generated image of the house and the front porch. It doesn't show— This is not something that only law enforcement can do, right? I mean, do other people have the technology? Yes. Yes. So it's something a defendant, once he knows that you have it, could either ask to see whatever you have or could actually hire someone to do his own. Yes. And it was made available. I mean, it was made available for inspection. When was it made available for inspection? In the supplemental discovery response where the FARO scan was discussed. It was told at that point that all that was available for inspection. Was that in the response specifically? Yes. You said the FARO scan can be examined? Yes. And it was also—the government noted that in R46, which was a service response to one of the post-trial motions for new trial. Did you attach the— I mean, obviously the court wouldn't normally have your exchanges of discovery. So did you— Is it in the record that you made that available? I believe as an attachment to R46 is an email that— Let me— And when you're saying R46, you're referring to the record in the district court, is that right? Yes. Page ID, I think 792 or 793. There's an email that discusses— And what is the docket entry number? R46, I believe. But that's at the motion for a new trial. That's a response to the motion— or a service response to the motion for a new trial. So that's—I thought his problem was not getting a reference to this in a timely way so that he could make use of it at trial. Well, it was, again, disclosed— the existence of it was disclosed four months before trial. But that's where it's only on this one reference in this one document, and as you called it, in a three-ring binder. Yes. Okay, so I'm befuddled by referring to something that's produced after a trial as saying that that complies with Brady. Well, attached to that— Was an email. Was an email that was sent four months ago with the Supplemental Discovery Packet, I believe. And the email you're saying refers specifically to the FARO scan. It does not refer specifically to the FARO scan. It says, here's the Supplemental Discovery— Which is the three-ring binder. Which shows that it was at least—it was disclosed before trial. I'm not finding the email attached to Document Entry 46. Okay, I'm sorry. Maybe I'm giving you the wrong— I'll have to double-check. Well, let's see. 46 is the United States' response to the motion for new trial. Can I look at my— If you want to supplement with something after a trial argument, that would be fine. But let me just tell you what my concern is. My concern is the argument that your opponent is making that there's some brief reference to a FARO scan in some document as opposed to a more fulsome divulging of this as would befit the U.S. government in a criminal case to show all the things that the U.S. government has looked at that relate to the innocence or guilt of the defendant. So how would you respond to that? The government—the FARO scan itself is not exculpatory evidence. It shows—if anything, it could maybe show as the bullet trajectories of where anyone was standing. It doesn't show whether Mr. Rafiti pointed his weapon or brandished his weapon, which is what he's charged with here. It doesn't contain any conclusions. It doesn't do really anything other than a 3D scan with measurements. The government didn't intend to use that at trial. It didn't feel that it was even necessarily helpful. It felt it was a piece of documentary evidence that it did not use at trial because, for those reasons, it really had very little evidentiary value as to what Mr. Rafiti was charged with, which was brandishing a weapon at federal agents. Mr. Reinke, as far as the procedure was concerned, the district in which I served, it was quite common for all the discovery to be provided to the defendant without any explanatory material. Is that your practice as well? In many cases, it is. It's up to the defendant at that point to look through the discovery and see if there's anything there. Sometimes the discovery is only— we will make a room full of documents available to you if it's a heavy document case. It will be available during these hours for your review. That's an accepted practice. Yes. So was the FARO scan made available to this defendant? If they wanted to before trial. They had to ask for it. It wasn't like the government saying, here, you might want to look at this FARO scan. We didn't feel that it was that valuable a piece of evidence. And we still don't feel it was that valuable a piece of evidence. Not to mention, Mr. Rafiti hired a private investigator who went out, took measurements, created a reenactment video. All this information was presented to the jury through Mr. Rafiti's private investigator, the reenactment video, and his report. There's nothing in that FARO scan that could have been favorable or more favorable to Mr. Rafiti than what was already presented. Could you address the crime of violence issue? Yes. What the government needed to prove in this case was Mr. Rafiti was charged with 111A, 1, and B. A1, and I don't agree with the contention that forcibly only applies to assault. Is there any case that you found on that topic? Just Burrell, which was the Fourth Circuit case, which doesn't really address whether forcibly applies to each individual. Statutory construction, you rarely see where it would be forcibly assaulted, forcibly resisted, forcibly opposed, forcibly impeded, forcibly intimidated, or forcibly interfered with a federal officer. It's the government's contention that forcibly applies to all those elements. What 11A sort of loses its significance in this case, doesn't it? Because of the way the indictment is worded? Because once the gun is attacked? No, no, because the way you charged it was they violated both 11A and B and the jury found both. And B is the offense that carries the more serious penalty, right? Right, yes. So why does A matter? Well, because he still had to be convicted of some conduct in A1 to get to B. Okay, I didn't understand then the argument made with your adversary about the structure of A1. I think I missed a point. Okay, well, I think our position is what we had to prove in this case was either forcibly assaulted, resisted, one of those with a dangerous, using a dangerous or deadly weapon. Well, that's all in 111B, though. Yes. Well, B doesn't B really has 111B says whoever in the commission of any acts described in subsection A uses a deadly or dangerous weapon. So we have to come within some part of A. Do I now understand? I keep looking back at the statute to try to understand it. So then we get to A1 because it's definitely not A2. No. So we're in A1. Was there forcibly assault? And then there's the comma, resist, supposes, impedes. And so there's the textual argument is forcibly applied to each of those. Assuming on the one hand that forcibly does apply to each word then is that enough? The combination of that reading of A1 plus B is that enough to make this a crime of violence? Yes. Using a deadly or dangerous weapon. So your opponent cites Reed Mendez. How does that apply here? I'm not familiar with Reed Mendez. So I'm not going to sit here and pretend that I am or try to make an argument about a case I don't know the holding. I think that the use of a dangerous weapon You did cite it in your brief though. I know. I'm sure I did. I'm sorry. Right now I just can't. Without knowing about the case then how do we know this is a crime of violence? We're using this categorical approach that the Supreme Court has told us to use. Are we saying then that forcibly assaults, resists, opposes has to be a crime of violence if you use a deadly weapon? Partially. And it's not really a categorical approach case in the sense of Johnson. We're not dealing with a prior conviction. We're dealing with the actual conduct in this case. The trial. The jury heard evidence about what Mr. Rafiti did. The jury heard evidence that was instructed on it. Does the Sixth Circuit say you don't use a categorical approach in that context? I'm not clear. With real world conduct? In determining what's a crime of violence is it the rule in the Sixth Circuit that if it's an offense before a jury you don't use a categorical approach? No, but the categorical approach historically applies to a prior conviction. I understand that, but courts are now applying it to real world events before a jury under 924C. Right, and under 924C I think the argument can be made that with this case we're not talking about how the crime is normally committed. We're not talking about... Oh, but we still take an elements approach, don't we? Yes. And I think we have two cases, Evans vs. Zick and a recent case, Taylor, that apparently, maybe wrongly, but apparently apply the categorical approach to deciding whether something is a crime of violence under 924C3. Taylor did actually find that and found that it upheld the actual residual clause 924C3B. And that was... it did a pretty lengthy analysis of the difference between the residual clause and armed career criminal and under 924 and it found the armed career criminal was more broad and involved more things and nine years worth of litigation in the Supreme Court. So could you give us your elevator speech for why this is a crime of violence using the categorical approach? Because the elements are force, he was charged with force, right there, physical force and use of a deadly weapon. So the statute requires physical force against the person? Yes, forcibly assaulted or impeded or all the other elements and also use of a deadly weapon. And what makes forcibly physical force in that statute? Well I think reading it in conjunction with using a deadly weapon. So what would be your best case to support your view? Probably the fact that some courts have found that just 111A1 alleged by itself is a crime of violence. The Fourth Circuit has found that and with the use of a deadly weapon that that would clearly then be a crime of violence as well. If A1 is a crime of violence, then A1 and B would have to be a crime of violence. And when you say the Fourth Circuit, is this Burel case? Yes it is. Has, whatever Taylor's implications are, and I pulled it right before coming in here, and I have been trying to read closely the part that goes to arguably this case, but what Sixth Circuit case law prior to Taylor says we use a categorical approach to 924C violations? I would describe it as an approach that couples the giving of a crime of violence instruction to the jury with the jury's ability to consider the facts of a particular case, but I can't tell you where that is found. Gagnon talks about how it's three separate offenses, but it doesn't really go into categorical. Well, I mean, isn't that, I mean, is what I described the procedure that is pretty much universally applied throughout the circuit? Yes. So it's not categorical in any, in the sense that Taylor and Shepard use those words. No, categorical really only kind of applies here by analogy. And I don't think Judge, I don't believe Judge Rogers uses that word. Does he? I mean. And Taylor? No. I don't believe he does. I don't believe they go through that kind of... One of the bases that he uses to distinguish Johnson is that 924C involves an ability to consider real world conduct. Yes. Which is what we have in this case. Not prior offense or how the crime is normally committed. So if we're looking at this case, though, it's, the use of the gun was waving it around or pointing it. The gun wasn't shot. The gun wasn't used to hit somebody. The gun didn't touch anybody. No. No, he brandished the gun. Right. And so that is, you're saying, is by itself a crime of violence. Yes. Any further questions anyone has? Thank you. Thank you, Your Honor. If I may use my time to address some of the Brady issues. Judge Gibbons, with respect to your question regarding the availability of ferroscans, again, as we do note in our briefs, those are, that is a new technology. We have attached a declaration from an expert that we retained to our reply brief. And there he states how difficult it is to get this technology. These machines cost about $65,000. And there are only five available in the entire state of Ohio. What about the do you have any recollection of the email referred to by Mr. Reinke? I do not. I was not counseled at that time. So I do not have recollection of any particular email. But just in that regard, I would just note to the court that the prosecutors in this case tried to evaluate the ferroscan, but they were not prepared to trial and were unable to because they did not have the requisite software. So I would suggest even if counsel had gone to the Bureau of Criminal Investigations to review the ferroscan, it may well have been unreadable then. Have you now reviewed it? Yes, we did review it. We created an exhibit that we do cite in here. We also provide a opportunity for this court, if it's so inclined, to look exactly what a ferroscan is. There is a sample of one available at the Ohio Attorney General's website to see how it's used and what it does. But I would also note to the court that this is, I think, very important. This court's decision in United States v. Tavera, which we cite on page 35 of our opening brief, that's 719F3705, and this court states that the Supreme Court's rejection of the idea that the prisoner still has the burden to discover the evidence is based in part on the fact that the prosecution has the advantage of a large staff of investigators, prosecutors, and grand jurors, as well as new technology such as wiretaps of cell phones. That is one of the reasons that these investigators must assist the defendant who normally lacks this assistance and may wrongfully lose his liberty for years if the information they uncover remains undisclosed. So, again, just a mere mention of something called a ferroscan does not suffice for disclosure, especially when there is no indication that we would have been able to use it or read it or open it up. The government had that problem a few weeks before trial. And finally, as we also note, the government had a duty to evaluate. It was the government's responsibility to evaluate this evidence that they created, but yet they let it go unevaluated. And the very purpose of these ferroscans are to do bullet trajectory analyses. The whole point of our argument is if we had this, then we would have been able to show the jury that the government's theory that my client stood outside the door and waved his gun would have been impossible without him having been shot four times. The mere fact that he was not shot shows that there was a mistake. At least we could have used that. What does it show? Does it show that he wasn't standing in the spot where they said he was standing? Is that what it shows? No. What a ferroscan is able to do is you can put people in locations they say they were and now have the bullet trajectories, the objectively measured bullet trajectories, to show that the argument was that here's a threshold of his house and he's walking outside. According to the government, he steps out, puts his hand this way, and slides to the left. There were four bullet holes in the door frame right on the other side of him. And all the testimony was that as soon as he stepped out, one of the officers opened fire. As a matter of fact, there was testimony originally that they thought that he had discharged his firearm, too, but he never did. Steps out, goes this way. What the bullet trajectories would clearly show is that all the bullets would have went right through him. But couldn't you show that without a ferroscan? I don't know how. Just the exact way you're showing it to us right now. I'm not able to position and show different scenarios about what may have happened, where the officers were, or use it to impeach the officers. So, Officer Bordenaro, you were standing where exactly? Now we can move the ferroscan in real time. It's called an immersive visual environment that you can provide to juries to actually transport them back in time, put them there in the crime scene, and now manipulate different perspectives. So you can have a witness say in real time, that's exactly where I was standing, rather than using vague imagination. Thank you very much. Thank you both for your argument. The case will be submitted. Would the court call any remaining cases?